**UNITED STATES of America,**
**Plaintiff,**

v.

**Vito GENOVESE, Defendant.**

**No. C 1127-52.**

United States District Court
D. New Jersey.

Aug. 16, 1955.

Raymond Del Tufo, Jr., U. S. Atty., Newark, N. J., by Albert G. Besser, Asst. U. S. Atty., New York City, for plaintiff.

Ascenzio R. Albarelli, Asbury Park, N. J., Joseph A. Fanelli, Washington, D. C., Joseph H. Freehill, Washington, D. C., of counsel, for defendant.

FORMAN, Chief Judge.

The defendant Vito Genovese was born in Italy in 1897. He immigrated to this country in 1913. and with the exception of a brief interval from May to August of 1933 when he returned to Italy on a pleasure trip he has resided here continously.

Pursuant to his petition for naturalization filed December 19, 1935, he was admitted to citizenship by the United States District Court for the Southern District of New York on November 25, 1936, as is evidenced by the Certificate of Naturalization No. 4,129,975, issued to him.

In November of 1952 the plaintiff commenced this action against him by filing a complaint in which it prayed for an order declaring null and void the order of the United States District Court for the Southern District of New York conferring citizenship upon him as well as the said Certificate of Naturalization issued to him pursuant thereto. The complaint alleged that defendant had procured his naturalization fraudulently and illegally because he practiced deception upon the court in which he was naturalized by making false statements and concealment of facts in the proceedings which led to his naturalization in that the defendant falsely represented that he had not been arrested prior to his application for naturalization, whereas he had been arrested at least eight times previously and that he had not been convicted of crime previous thereto whereas he had been convicted on at least two separate occasions. prior to his said application.

In his answer the defendant generally denied the allegations of the plaintiff charging him with fraudulently and illegally procuring his naturalization. A number of separate defenses are set up in the answer such as the unconstitutionality of Section 738(a), Title 8 U.S.C.,[1] under which the complaint was. brought, laches, violation of the due process clause of the Fifth Amendment to the Constitution, etc. These were not particularly pressed by the defendant and the real issue in the case is raised by the allegations of false representation and concealment recited in the complaint and their denial.

The evidence disclosed that the defendant executed the usual Form A–2214,. Application for a Certificate of Arrival— Preliminary Form for Petition for Naturalization. This is the conventional blank that is issued to those seeking citizenship and contains numerous questions to be answered by the applicant in spaces provided therefor. In this case the answers were made in the handwriting of some one other than the defendant, but he placed his signature on the form in several places. There is a rubber stamp on the fourth page of the form indicating that it was received by the Immigration and Naturalization Service New York, New York on March 18, 1935.

On December 19, 1935 the defendant and his two witnesses were called before a Naturalization Examiner of the Service, named Helen Herckt, who reviewed the answers to the questions with the defendant. This Examiner died some time ago but her handwriting was identified by a surviving fellow-employee of the

1. Succeeded by 8 U.S.C.A. § 1451(a) which became effective on December 24, 1952, after the filing of the complaint in this suit.

Service who also interpreted the symbols and characters placed upon the form and testified to the general procedure applied by examiners at the time defendant made his application.

On page 1 of the form are check marks in red ink against the defendant's name, place of arrival, date of arrival and name of the vessel.

On the second page are other words, symbols and characters in red ink indicative of the work of the Examiner in checking the answers to the questions. Among the questions on this page is the following:

"31. Have you ever been arrested or charged with violating any law of the United States or State or any city ordinance or traffic regulation?—if so give particulars—"

In the handwriting of the person who answered all of the questions on the form originally the answer to the question is "No", and there is an irregular line after the directive to give particulars. The word "No" is ringed in red ink and the initials "NCR" appear in handwriting alongside of the printed question. There can be no doubt that the Examiner made this marking at the time of review of the paper with the defendant to indicate that she had confirmed the question and his answer. The initials "NCR" stand for "no criminal record". This page bears the admitted signature of the defendant.

The third page, which is headed "Statement of Facts to be Used in Filing my Petition for Citizenship," contains the defendant's signature on the first line at the top as well as on the line provided for it on the bottom of the page. This page has a large number of red inked entries patently made by the Examiner. There are also words written by the Examiner in red ink amending the answers, with her initials and the date of the examination, December 19, 1935. In all, on pages two and three, the Examiner made seven changes in red ink, numbering each consecutively. At the very bottom of page three there appears the comment "changes 1 to 7, incl. approved by me" and immediately beneath this writing is the signature of the defendant.

On the same day the defendant executed a petition for naturalization on Form 2203 and his two witnesses executed their affidavits on the said form. This form contains the handwriting of a Naturalization Examiner named J. A. G. Stitzer, who was the superior of Examiner Herckt. He is also deceased. His handwriting was likewise identified by his long contemporary. It is apparent that Mr. Stitzer reviewed the results of Herckt's examination as she summarized it again in red ink on the reverse side of defendant's petition for naturalization.

Mr. Stitzer made comments under the heading "Adjournments" dated December 19, 1935; May 4, 1936 and June 4, 1936. Eventually the date for final hearing was noted as November 25, 1936. There is a very indistinct rubber stamp on the reverse side of this form filled in in the handwriting of Mr. Stitzer as follows:

| Rubber Stamp Wording | Answers in Mr. Stitzer's handwriting |
| --- | --- |
| Absence from U. S. | As per Ex's report No other absence. |
| Arrests, etc. | No. |
| Witnesses verify above-absences, arrests, etc. | Yes. |
| Date | 12/19/35. |

There is also noted in Mr. Stitzer's handwriting information concerning defendant's wife and child, uncontradicted by the defendant, which normally and logically would be given by the defendant.

The defendant's recollection of this entire proceeding is very vague. He did not remember who filled out the blank places containing the answers to the questions for. him prior to its being forwarded to the Naturalization Service in New York. He did not remember being interrogated by Examiner Herckt and had only a hazy recollection of any examination with his witnesses at all. He denied being asked Question 31 "Have you ever been arrested or charged with violation of any law of the United States or State or any city ordinance or traffic regulation?—If so, give full particulars. —"

The defendant offers as his version of the interrogation concerning his criminal record that at some time during the course of his naturalization proceeding he was asked whether he had ever been convicted of a felony. He says that he stated that he did not know what a felony meant and he was then asked a question to the effect "Did you ever serve in State Prison or have you ever been convicted of a federal offense, meaning jail over a year?" He answered that he had misdemeanors against him and that he had arrests against him, but he was told that there was no interest in them.

Under the Naturalization Regulations issued by the Immigration and Naturalization Service, Edition of July 20, 1935, in effect at the time of defendant's application, it was provided:

"Subdivision G.—Investigation of naturalization and citizenship matters.

"Paragraph 1. It shall be the duty of the appropriate naturalization officers or examiners to investigate thoroughly the qualifications and eligibility of applicants for citizenship and their witnesses, and applicants for certificates of citizenship and their witnesses, to make the necessary reports of all the pertinent facts to the courts, and to submit such reports as may he required to the heads of field districts or subdistricts, and to the Commissioner of Naturalization.

"Paragraph 2. Wherever practicable preliminary examinations of applicants for citizenship and their witnesses will be made in person. The principal purpose of such examinations is to obtain information bearing upon the applicant's admissibility to citizenship and the qualifications of the witnesses, rather than to obtain responses for record purposes. Both the applicant and the witnesses shall be carefully interrogated to determine whether the applicant has complied with the jurisdictional requirements of law, is. mentally and morally qualified for citizenship, is attached to the principles of the Constitution, and is well disposed to the good order and happiness of the United States. *The question of possible arrests must be thoroughly covered. If the applicant has been arrested or charged with the violation of any law or ordinance, all the facts will be ascertained, including information as to whether conviction resulted.* Particular attention must be given to the determination of the applicant's marital history and the whereabouts of his wife and minor children. The questions will be repeated in different form and elaborated until the examiner is satisfied the person being interrogated fully understands them. The witnesses shall be questioned to develop not only their own credibility and competency, but the extent of their personal knowledge of the applicant's residence, moral character, and attachment to the principles of the Constitution. Search will be made of appropriate court and other records in establishing the qualifi-

cations of the applicant and the witnesses." (Emphasis supplied.) pp. 70–71.

The evidence disclosed that, in fact, the defendant had been arrested and convicted as follows:

### Arrests in New York

|  | Date | Place | Charge | Disposition |
|---|---|---|---|---|
| 1. | April 22, 1918 | Queens | Felonious Assault | Discharged |
| 2. | April 25, 1924 | Manhattan | Illegal Possession of Weapon | Discharged |
| 3. | May 13, 1924 | Brooklyn | Homicide by Auto | Discharged |
| 4. | July 25, 1925 | Manhattan | Burglary | Discharged |
| 5. | October 10, 1925 | Queens | Homicide | Discharged |
| 6. | December 4, 1934 | Brooklyn | Homicide | Discharged |

### Arrests in New Jersey

|  | Date | Place | Charge | Disposition |
|---|---|---|---|---|
| 7. | January 17, 1925 | Hoboken | Disorderly Person | Discharged |
| 8. | January 13, 1931 | Jersey City | Possession of Concealed Weapons | No Bill |

### Arrests and Convictions

|  | Date | Place | Charge | Disposition |
|---|---|---|---|---|
| 9. | April 15, 1917 | Manhattan | Illegal Possession of Revolver | 60 days in Workhouse |
| 10. | January 29, 1927 | Brooklyn | Carrying a Dangerous Weapon | $250 Fine 30 days in City Prison |

The defendant, in addition to his denial that he was interrogated concerning his arrests other than as he described the questioning, offered the testimony of one of his witnesses at his naturalization hearing to corroborate him. He could not recall that the defendant or he was queried as to arrests of the defendant but it must be remembered that the hearing was many years ago and although the witness was a lawyer his recollection of all that went on at the hearing had to be subject to the ravages of time.

He also offered the testimony of four character witnesses. This type of testimony, unusual in a civil case, was objected to by the plaintiff. The defendant justified it on the ground (a) that the plaintiff had in the cross-examination of the defendant endeavored to impeach him by showing a variance between testimony given at a pretrial deposition and evidence given by him at the trial and (b) that the complaint assailed defend-

ant's moral character by charging him with deliberate fraud.

It is conceded that the authorities are divided on the admissibility of character evidence on the first ground on which defendant based its offer. 4 Wigmore on Evidence §§ 1108–1109 (1940 Ed.). The cross-examination of the defendant by the plaintiff was the normal inquiry of its sort. No serious impeachment of the testimony of the defendant resulted from the cross-questioning. Hence even if I were disposed in favor of the admissibility of such testimony it would have no utility in this case.

The defendant buttressed the second basis for the admissibility of this evidence on the ground that the civil action for cancellation of naturalization is akin to a criminal action and the character of the burden of proof to be borne by the plaintiff is more like that in a criminal case. Defendant cited a number of cases where references were made to character

testimony. But in each it was apparently received *without objection.*[2]

Again, Wigmore in § 64 says that the general rule is against the admissibility of evidence showing the character of a party in a civil cause. However, he modifies this generalization by saying "It may, however, be maintained that the reasons of policy apply in ordinary civil cases only and that where a moral intent is marked and prominent in the nature of the issue the defendant's good moral character should be received as in criminal cases. This view has in more modern opinions gained ground, and is worth recognizing."

In New Jersey character evidence is not admissible in a civil action, Rittenhoffer v. Cutter, E. & A.1912, 83 N.J.L. 613, 83 A. 873. However, exceptions were made in situations where it has been held relevant to an issue being litigated. Sayre v. Sayre, Sup.Ct.1855, 25 N.J.L. 235; O'Brien v. Frasier, Sup.Ct. 1885, 47 N.J.L. 349, 1 A. 465.

In its report to the New Jersey Supreme Court published in May, 1955, the drafters of a proposed revision of the law of evidence for New Jersey noted these cases in approving Rule 47 of the Uniform Rules of Evidence of the National Conference of Commissioners on Uniform State Laws, Boston, 1953. The pertinent portion of Rule 47 is as follows: " * * (W)hen a trait of a person's character is relevant as tending to prove his conduct on a specified occasion such trait may be proved * * *"

The whole gist of plaintiff's action revolves around the alleged fraud practiced by the defendant. The objective of the litigation is to deprive the defendant of his status as a citizen. This is indeed a singular cause of action. It will not render the defendant liable to a money judgment nor does it seek to take away his property in the nature of a penalty. It is intended to work a much greater hardship, that is, to render the defendant an alien denuded of his rights and privileges of citizenship, and is a sanction much more difficult to endure than the prescribed sentences for many crimes. Under these circumstances I am constrained to agree that in this particular type of action the defendant's offer of proof of relevant character testimony should be received as in a criminal case. The plaintiff's objection to the character testimony is overruled.

It appears certain that someone of the defendant's choice made the answers to the questions on the preliminary form for petition for citizenship for the defendant. The answers to these questions are in the greatest of detail concerning the village in Italy in which he was born; the date of his birth; the name of the ship on which he arrived; the name of the steamship line; the class of his passage; the name of his father; persons with whom he traveled; the names of his first and second wives; their dates of birth and those of his children. All of this information which is set down with careful accuracy could have come only from the defendant. It is only reasonable to believe that Question 31 in the precise form as contained in the report was asked of him and that he authorized the answer "No" before it was sent to the Office of the Naturalization Service in March of 1935.

The red-inked notations of the deceased Examiner Herckt speak eloquently in her absence. There is no reason to doubt that the meticulous care with which she checked information given by the defendant, made corrections, and got him to sign as to the accuracy of the corrections, makes it a probability of the highest order that she asked him the question concerning his arrest and conviction in accordance with her instructions and circled his answer "No" to indicate that this had been done and added the initials "NCR" to indicate that she had been told that he had "no criminal record".

Similarly, the notations by Examiner Stitzer are corroborative of the regu-

---

**2.** United States v. Manzo, D.C.D.N.J.1945, 59 F.Supp. 447, 488; United States v. Mazzoni, D.C.M.D.Pa.1942, 43 F.Supp. 56, 58; Jogwick v. United States, 4 Cir., 1944, 142 F.2d 988, 999.

larity and general inclusiveness of his examination of the defendant and his witnesses.

Weighing all of the testimony offered by the defendant against that of the plaintiff leaves the case in such a state that the plaintiff has sustained its burden by clear, unequivocal and convincing proof that the defendant was asked the definitive question No. 31 "Have you ever been arrested or charged with violation of any law of the United States or state or any city ordinance or traffic regulation?" And that in answer he gave the false reply "No."

The question and answer are there on the blank he forwarded or caused to be forwarded to the Naturalization Service. The marks upon that form by the two deceased Naturalization Examiners leave no room for doubt that they followed the regulation of their Department instructing them to enquire carefully concerning arrests of applicants for citizenship. Defendant's present denial of this course and his assertion that when he volunteered information concerning arrests and convictions for misdemeanors they were brushed aside inspires no confidence.

■ Ordinarily this finding would be dispositive of the case for it has been often held that false statements and concealment of material facts to the naturalization authorities during the course of proceedings for naturalization are grounds for holding that the nautralization was fraudulently and illegally procured. Cases in this district so holding are United States v. Di Blasi, D.C., 1 F.Supp. 28 (misrepresentation as to place of residence); United States v. Marcus, D.C., 1 F.Supp. 29 (false statement as to unmarried status); and United States v. Accardo, D.C., 113 F.Supp. 783, affirmed 208 F.2d 632 (false statements and concealment of material facts relating to criminal record).

■ The defendant, however, argues that his failure to acknowledge the several arrests and two convictions prior to the five-year period preceding his application for naturalization in December of 1935 as well as the two arrests during the five-year period prior thereto could not have barred his naturalization. Hence his failure to reveal his police record is immaterial and cannot serve as a basis for denaturalization.

The defendant rests heavily for his contention in this respect on the case of United States v. Kessler, 3 Cir., 1954, 213 F.2d 53. In that case the defendant was engaged, in 1929 and 1930, in peacefully picketing the plant at which she worked which had been struck. From time to time the police would arrest the persons constituting the picket line. Along with others, she was arrested 17 times, sometimes as a picket and sometimes as a bystander. When brought before the magistrate and charged with the offense of "obstructing highway," each time she was discharged. While admitting that she had been arrested in the sense that she had been taken before the magistrate by uniformed officers of the Philadelphia police force she denied that her answer "No" to question 29 on the application (similar to question 31 in this case) which she executed, and on which she was interrogated by the naturalization examiners, was false and fraudulent. She reasoned that she was not required to recount these arrests.

The majority of the Court held

" * * * (O)ne cannot claim that a person was arrested for 'Obstructing highway', a crime then, and probably now, unknown to the law of Pennsylvania, and assert that the arrest was one made in accordance with law. We therefore disagree with the ruling of the court below that the arrests were legal and valid. See 104 F.Supp. at page 437. As a matter of law they were illegal and invalid. They were at best 'false arrests', Meyers v. Tygh, 1920, 75 Pa.Super. 271, 272, and as a matter of law Kessler was subjected to 'false imprisonments.'" 213 F.2d at page 56.

"We are also of the opinion that if the term 'arrested' as used in Question 29 was intended to include a

false or illegal arrest at least of the kind to which Kessler was subjected, the Immigration and Naturalization Service passed beyond the borders of its statutory authority. It was the intention of Congress in enacting the Naturalization Act of 1929, as it was in enacting the earlier and later Acts governing naturalization and immigration, to exact from the applicant for citizenship any information which would be pertinent to and shed light upon the moral character of the applicant. The 'false arrest' to which Kessler was subjected affirmatively appears as false *as a matter of law* on the face of the record—the magistrate's docket—because the 'arrest' was for a purported offense which had no existence in the law of Pennsylvania. The persons who made the 'arrests' were mere trespassers. See Baird v. Householder, 1858, 32 Pa. 168, 169, discussed in note 6, supra. The apprehendings of Kessler, subjecting her to false or illegal detentions of the kind presently before us, cannot be deemed properly to throw light upon her moral character. The inquiry under the circumstances was too remote from the purpose of the statute to stand as valid." 213 F.2d at page 58.

The defendant further stressed, as supporting his contention that the falsity of defendant's answer in the instant case was in any event immaterial because none of his arrests or convictions could have been the basis for a denial of citizenship to him, the following 9th footnote in the Kessler case:

"9. We have found no decision and none has been cited to us where citizenship has been revoked for failure to disclose facts the revelation of which would not have justified refusal of citizenship in the first place." 213 F.2d at page 58.

Taking his cue from the dissenting opinion in the Kessler case the defendant here has argued that there the Court overruled the case of United States v. Accardo, supra, decided by it six months previously. Application of the Kessler case to the present state of facts, he submits, leads to the conclusion that here, too, where revelation of facts would not have justified refusal of citizenship, the undisclosed facts cannot be considered material and the nondisclosure is therefore not fraudulent.

I cannot believe that this was the intended meaning of the majority opinion or of Footnote 9 in the Kessler case. That case turned on the fact that her arrests were illegal and void. Since she had never been legally arrested it was held that there was no falsity in the denial she made to the question relating to arrests in her petition. Such is not the case with this defendant. He had been arrested and charged with offenses cognizable by law ten times, with convictions resulting twice. His denial of these arrests and convictions was a falsehood regardless of whether the arrests would have constituted a basis for a refusal to grant him citizenship. The mere fact that some of the arrests and the convictions took place more than five years prior to the defendant's denial of this occurrence does not lessen the falsity of that denial. Although the arrests and convictions in themselves might not have provided sufficient basis for a denial of citizenship, certainly their disclosure would, or at least could, have motivated a more extensive investigation of defendant's past, especially within the five-year period prior to his petition, which investigation might have uncovered facts sufficient to require a refusal of naturalization. To that extent they were material and their nondisclosure under the circumstances attendant was fraudulent, and therefore constitutes a valid basis for revocation of citizenship. United States v. Corrado, D.C.E.D.Mich.1953, 121 F.Supp. 75; United States v. Accardo, D.C.D.N.J.1953, 113 F.Supp. 783, affirmed 3 Cir., 1953, 208 F.2d 632.

Under defendant's hypothesis he would put a premium on falsehood, for an applicant with arrests more than five years previous to filing his petition for

naturalization could, with impunity, lie about their existence and thus escape the likelihood of more than the usual cursory investigation of his conduct during the critical five-year period.

The decision in the Kessler case, including Footnote No. 9, it must be concluded, was intended to apply to the circumstances involved therein. There is absent from it any specific statement that it was intended to demolish the Accardo case and the decisions underlying it and it may not be taken on inference that such was its intent.

■ Nor can the theory of the plaintiff's case be restricted to the allegations that the citizenship was fraudulently obtained by virtue of the nondisclosure of the criminal record as the defendant would have it. The third paragraph of the complaint states as follows:

"That said naturalization was illegally procured in that the said defendant, during the five year period preceding the date of his application for naturalization, had not behaved as a man of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same, as required by the provisions of the Nationality Act of 1906 (June 29, 1906, c. 3592, Sec. 4, 34 Stat. 596) in that

"The said defendant practiced deception upon the United States District Court for the Southern District of New York by false statements and concealments of facts in the proceedings which led to his naturalization as is hereinafter set forth in Paragraphs 5 and 6 of this complaint."

(Paragraphs 5 and 6 allude to the record of arrests and convictions acquired by the defendant prior to 1934.)

The gravamen of the charge in this paragraph of the complaint is that the concealment of the record of arrests and convictions was *itself* an act repugnant to principles of good moral character, said act having taken place within the five years immediately preceding the date of application for naturalization even though the bulk of the arrests and the convictions accrued beyond the five-year period. Such a hypothesis was received with favor by the court, along with other bases for the holding, in United States v. Accardo, supra, where the concealment of convictions by defendant in his application was held as evidence supporting an allegation of bad moral character within the five-year period prior to application as well as evidence of fraud. See also United States v. Marcus, supra. In United States v. Corrado, supra, involving a fact situation almost identical to the case at bar, the court said:

"His very act in falsifying the facts indicates that at the time he did so he was not ' "a person of good moral character" '. * * * " 121 F.Supp. at page 79.

■■ Of course it is necessary to be completely mindful of the admonition of the Supreme Court that the cancellation of citizenship may result in the direst of consequences and that once the right is conferred it should be taken away only upon the clearest justification and proof, especially when the attack is made long after it was granted. Schneiderman v. United States, 1943, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796. At the same time before granting the right the plaintiff is entitled to frank, honest and unequivocal information from the applicant for the privilege of citizenship which is likely to throw light upon his qualifications or disqualifications for it.

■ I find that plaintiff has prevailed in showing that the defendant intentionally falsely answered question 31; that plaintiff's agents acted upon said false information resulting in his procurement of his citizenship by fraud and illegality.

Hence, the plaintiff is entitled to a judgment declaring null and void the order of the United States District Court for the Southern District of New York, dated November 25, 1936, in which citizenship of the United States was con-

ferred upon the defendant and that Certificate of Naturalization No. 4129975 issued out of said court to him pursuant to the said order, shall be set aside, cancelled, annulled and declared void in accordance with the prayer of the complaint herein.

The matters and things set forth in this opinion shall be regarded as findings of fact and conclusions of law as required by Rule 52(a) F.R.C.P., 28 U.S.C.A.

Notice shall be given by the plaintiff of the settlement of an order in conformity herewith.